**Edmond G. PHARO et al.,**
**Plaintiffs-Appellants,**

v.

**W. L. SMITH et al.,**
**Defendants-Appellees.**

No. 77–1273.

United States Court of Appeals,
Fifth Circuit.

July 9, 1980.

Rehearing Granted In Part
Sept. 18, 1980.

---

Morris K. Sirote, Birmingham, Ala., for plaintiffs-appellants.

James O. Spencer, Jr., Birmingham, Ala., for Deltec International Limited.

Before SIMPSON, TJOFLAT and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

This is a securities fraud case. In the proceedings below, the district court granted the motion for summary judgment of one of the defendants, Deltec International, Ltd. (Deltec), on all claims, and entered final judgment pursuant to Fed.R.Civ.P. 54(b). In this appeal from that judgment, we find no merit in plaintiffs' federal securities laws claims against Deltec and affirm.

I

All of the plaintiffs' claims in this case arise out of their purchases of common stock in Smith's Pride Foods, Inc. (Smith's Pride), a Delaware corporation with headquarters in Birmingham, Alabama. The plaintiffs purchased the stock over an eight month period, from mid-September 1968 to April 1969, as Smith's Pride was preparing to "go public" in the over-the-counter market. Each of the plaintiffs purchased his stock anticipating that his shares would be registered with the issue to be offered to the public and that he would make a sizeable profit in the market when the offering was eventually released. Unfortunately for the plaintiffs, the over-the-counter stock market collapsed before the Smith's Pride underwriting could be registered with the Securities and Exchange Commission (SEC) and the stock sold. Without the additional capital from the registered underwriting, Smith's Pride's fortunes soon took a turn for the worse, and plaintiffs commenced this action in an effort to recoup their losses.

Smith's Pride was formed under Alabama law in February 1968 by two brothers, W. L. and A. J. Smith, and W. L.'s son, G. L. Smith. The Smiths were prominent in the poultry business, having maintained an integrated operation—growing, slaughtering, processing, and selling—in the Birmingham area for many years. W. L. and A. J. Smith were also in the meat brokerage business, operating under the name W. L. Smith Poultry Company. That company was liquidated shortly before the incorporation of Smith's Pride, and most of its assets, along with other business assets held by the family, were transferred to Smith's Pride in exchange for stock. W. L. Smith became chairman of the board of directors and president of the new company, and appears to have been the unofficial spokesman for the family's interests involved in this litigation.

Smith's Pride's business outlook was encouraging from the moment the company was organized. By the conclusion of the first six months of operations, the Smiths considered going public and discussed the idea with a local representative of Andresen and Company (Andresen), a Wall Street underwriter. Andresen was sufficiently impressed with Smith's Pride's business potential to pursue the matter, and promptly introduced W. L. Smith to Frederick R. Addler, a New York lawyer specializing in corporate finance. Addler concluded that the company had great potential, but that it was too early to go forward with an underwriting. He promised to give the matter further consideration after reviewing Smith's Pride's operations in nine months. Addler advised Smith to take two steps in the meantime to facilitate a future registration of Smith's Pride stock with the SEC: (1) the reincorporation of Smith's Pride under Delaware law and (2) the employment of a national certified public accounting firm to perform the audit work and to prepare the financial statements necessary to effect the registration. This advice was followed; on September 16, 1968, Smith's Pride Foods, Inc., was chartered in Delaware, and Peat, Marwick, Mitchell & Company was employed to do the auditing and financial work. On September 27, Smith's Pride of Alabama was merged into its Delaware counterpart. After the merger, W. L. Smith and A. J. Smith owned approximately one million shares, about 90 percent of the issued and outstanding shares of the company's stock.

W. L. Smith was eager to share the future of his company with some of his good customers. On August 16, 1968, Smith sold 20,000 of his shares, at $5.00 per share, to Tine Davis, a principal officer of Winn-Dixie Stores, Inc., which had done considerable business with the Smiths over the years. Smith informed W. M. Wright, Smith's Pride's vice-president for sales, of his willingness to sell some shares to his good customers, but cautioned Wright that the securities laws required that the sales be made only to Alabama residents and to no more than 25 persons.

It was not long before Wright let several Smith's Pride customers know of the plan to take the company public. Wright told them that the business had been growing rapidly and that the future held great promise. They were also informed that Smith's Pride had a contract with the federal government to operate a training program for the hard-core unemployed and that the contract would prove to be very profitable. According to Wright, those who purchased Smith's Pride stock before the public offering stood an excellent chance of making a sizeable profit. Wright represented that the new stockholders could register their shares with the public issue, and that, when the issue reached the market, the stockholders could either recoup their entire investment by selling just one half of their holdings or realize an immediate profit by selling out altogether.

Plaintiff Sam Virciglio was the first to respond to Wright's touting. On September 10, 1968, he purchased 10,000 shares of Smith's Pride stock at $5.00 per share. He advised Wright that the stock was being purchased for himself and eight others, but Wright told him that because of the 25 shareholder limit, the sale would have to be treated as if it were being made to one person. Hence, the stock certificate was issued in Virciglio's name only. The next sale Wright arranged was on October 7, 1968, to plaintiff Edmond G. Pharo—15,000 shares at $5.00 per share. While Pharo, like Virciglio, bought for himself and others (two), the stock certificate was issued in Pharo's name only. On October 21, 1969, Wright negotiated a 5,000 share sale at the $5.00 price to plaintiff John Davis. On the following day he handled a sale of 13,000 shares, again at $5.00, to plaintiff J. F. Costa. Costa bought for himself and three others, but received the certificate in his name to avoid the possibility that the 25 purchaser limit might be exceeded. The last sale Wright arranged was on October 29, 1969, to plaintiff Daniel B. Haralson— 5,000 shares at the $5.00 per share price.

In each of these transactions, the purchasers paid for the stock with personal

checks payable to Smith's Pride. The stock, however, came from W. L. Smith, personally; on each occasion, he surrendered his own shares, and the company issued a new certificate in the name of the purchaser.

Smith's Pride's business continued to improve, and by January 1969, Addler was retained to take the company public. Addler also became a stockholder, acquiring 37,500 shares from W. L. Smith and a like number from A. J. Smith. Addler's law firm completed the preparation of a prospectus for a Smith's Pride stock offering shortly after Peat, Marwick, Mitchell and Company's financial statement of March 29, 1969 became available. On April 3, the final two stock transactions with plaintiffs took place. W. L. Smith sold 3,000 shares of his Smith's Pride stock to J. C. Weeks at $8.00 per share and 5,000 shares to Rex Hollis, who split the purchase with J. P. Lovoy, at $9.00 per share, though the stock was issued to Hollis only.

Later in April, Addler met with Smith's Pride's board of directors to discuss the public offering. The board hoped the stock could go on the market at $8.00 per share. The over-the-counter market had gone into a sharp downturn, however, and Addler said that an $8.00 price was out of the question. He recommended, instead, a private placement at a price of $5.00–$6.00 per share. The board rejected the recommendation and instructed Addler to explore the possibility of arranging a long term loan to obtain the capital necessary to meet the company's expansion plans. When the stock market improved, the board said, a public stock offering would be reconsidered.

Addler thereafter obtained a tentative commitment from Massachusetts Mutual Life Insurance Company for a $1 million loan to Smith's Pride; but before a firm commitment could be made, the money market tightened, and Massachusetts Mutual's available funds became so scarce that Smith's Pride's application was rejected. Having been turned down by the insurance company, and seeing no real prospects for a public stock offering, Addler washed his hands of the whole affair.

This did not deter the Smiths and their small group of investors, however. By the end of 1969, Kohlmeyer and Company (Kohlmeyer) indicated an interest in underwriting a Smith's Pride stock issue at $9.00 per share, and, by November 1970, was prepared to go forward with an SEC registration. The potential underwriting was killed, however, when a federal audit of Smith's Pride's training program indicated that the company was indebted to the Government for about $2 million.

At the company's annual stockholders meeting in December 1970, W. L. Smith offered to buy back the plaintiffs' stock at $5.00 per share or to exchange their shares for stock of Smith's Industries, Inc., a corporation to be formed to acquire ownership of several of Smith's companies, including Smith's Pride. The plaintiffs rejected Smith's offer, and on May 4, 1971, brought this suit against Smith's Pride, Smith's Industries, Inc. (which had been incorporated January 29, 1971), Metropolitan Educational Training, Inc. (incorporated in March 1969 to assume the operation of Smith's Pride's training program), the Smiths, and W. M. Wright. The complaint alleged that the defendants were liable to the plaintiffs for money damages for violating federal and state securities laws: section 12, 15 U.S.C. § 77*l* (1976), section 15, 15 U.S.C. § 77*o*, and section 17(a), 15 U.S.C. § 77*q*(a), of the Securities Act of 1933 (the Securities Act); section 10(b), 15 U.S.C. § 78*j*(b), and Rule 10b–5, 17 C.F.R. § 246.10b–5 (1979), and section 20(a), 15 U.S.C. § 78*t*(a), of the Securities Exchange Act of 1934 (the Exchange Act); and title 53, section 45 of the Securities Act of Alabama. The complaint also contained a stockholders' derivative action, under Alabama law, against the Smiths as the management of Smith's Pride.

On February 1, 1972, while this suit was pending, an involuntary bankruptcy petition was filed against Smith's Pride, and, on March 9, 1972, the company was adjudicated a bankrupt. On May 5, 1972, the plaintiffs were granted leave to amend their complaint and to add Deltec as a party

defendant. The plaintiffs had apparently discovered the following facts, none of which are in dispute, concerning Deltec's previous relationship with the Smith brothers and Smith's Pride.

Deltec and its predecessor, International Packers, Ltd., (referred to collectively as Deltec) is one of the largest packers of foreign beef operating in the United States. The Smith brothers had done business with Deltec for several years prior to the formation of Smith's Pride, and W. L. Smith had represented Deltec in Alabama and the southeastern states. When Smith's Pride was formed, one of the the assets W. L. and A. J. Smith contributed to the company in exchange for stock was $212,000 worth of foreign beef they had purchased from Deltec. At the time Smith's Pride acquired the beef, Deltec claimed that the Smith brothers owed it, on open account, $493,000; and when the Smiths disputed the amount of the balance due, Deltec, on March 6, 1968, brought suit against them in district court. The Smiths' defenses were that the balance claimed to be due on the account was in error and that the indebtedness was not theirs but was, instead, an obligation of W. L. Smith Poultry Company (which had been liquidated). Finally, the Smiths counterclaimed, alleging that Deltec had breached an agreement that called for the Smiths to be the exclusive dealer of Deltec products in the southeastern United States. The suit proceeded to trial on October 3, 1968, and that day, after the jury was sworn, the parties settled.

The parties had been negotiating a settlement of the law suit for some time. At one point the Smiths offered Deltec $250,000 in cash to dispose of the case, but Deltec rejected the offer. Deltec countered with an offer to accept the Smiths' $500,000 promissory note, payable in one year. The Smiths, indicating that they were relying on the advice of their underwriter, Andresen, replied that a settlement in that form was unacceptable because it might jeopardize the public stock offering Smith's Pride was contemplating. Further negotiations resulted in a settlement calling for the Smiths to transfer to Deltec 100,000 shares of their stock in Smith's Pride and then to buy the shares back at $5.00 a share over a period of twelve months. Andresen voiced no objection to this, and the parties promptly executed a written settlement agreement, and the law suit was dismissed.

Pursuant to the settlement agreement, the Smiths transferred 100,000 shares of their Smith's Pride stock to Deltec and obligated themselves to buy the stock back over the next twelve months at $5.00 per share.[1] Several restrictions were placed on the transferability of the stock: (1) Deltec was precluded from selling the stock to anyone except the Smiths unless the shares were "registered under the Securities Act of 1933" or Deltec's counsel were of the opinion that such registration was not required, and (2) the Smiths were precluded from selling any of the shares repurchased from Deltec unless the shares were "registered under the Securities Act of 1933" or the Smiths' counsel were of the opinion that such registration was not required. On the certificates of the shares Deltec acquired from the Smiths, Deltec affixed a legend summarizing this restriction.

To give Deltec the benefit of any increase in market price that Smith's Pride's stock

1. The repurchase schedule was as follows:

| Purchase Date | Shares to be Purchased | Purchase Price |
|---|---|---|
| Nov. 1, 1968 | 8,000 | $ 40,000.00 |
| Dec. 1, 1968 | 8,000 | 40,000.00 |
| Jan. 1, 1969 | 8,000 | 40,000.00 |
| Feb. 1, 1969 | 8,000 | 40,000.00 |
| Mar. 1, 1969 | 8,000 | 40,000.00 |
| Apr. 1, 1969 | 8,000 | 40,000.00 |
| May 1, 1969 | 8,000 | 40,000.00 |
| June 1, 1969 | 8,000 | 40,000.00 |
| July 1, 1969 | 8,000 | $ 40,000.00 |
| Aug. 1, 1969 | 8,000 | 40,000.00 |
| Sep. 1, 1969 | 10,000 | 50,000.00 |
| Oct. 1, 1969 | 10,000 | 50,000.00 |
| TOTAL | 100,000 shares | $500,000.00 |

In the event the Smiths defaulted in making any of these scheduled purchases, Deltec had the right to accelerate the Smiths' obligation to

might experience during the buy-back period, the parties agreed that Deltec had the option of cancelling the Smiths' repurchase obligation at any time. In the event of such a cancellation, Deltec would own, unemcumbered, whatever shares it held at that moment and would be free to sell them, subject, of course, to the registration requirements of the securities laws, federal and state. Because the Smith's Pride public offering never became a reality, Deltec never executed the option. It relied, instead, on the Smiths' buy-back obligation, which the Smiths eventually satisfied in full.

In the amended complaint, plaintiffs charged Deltec with essentially the same securities violations as those pressed against the other defendants. All of the defendants were charged with violating section 12(1) of the Securities Act by selling securities that were not registered with the SEC as required by section 5 of that act. Another purported basis for section 12(1) liability on Deltec's part was the "control party" theory embraced by section 15 of the Securities Act. The plaintiffs alleged that Deltec was a control party because it owned a controlling interest, in the form of 100,000 shares of stock, in Smith's Pride, or had the power to control any distribution of Smith's Pride stock. Deltec was also alleged to have been liable as an underwriter, under section 2(11) of the Securities Act, 15 U.S.C. § 77b (11) (1976), as a result of the sales of the unregistered Smith's Pride shares.

Deltec was charged with liability under the antifraud provisions of the Securities Act, sections 12(2) and 17(a), and the Exchange Act, section 10(b) and Rule 10b–5, for (i) aiding and abetting the Smiths and W. M. Wright in making certain false statements and omitting material facts in connection with the sales of Smith's Pride stock to the plaintiffs and (ii) engaging in a conspiracy with one or more of those individual defendants, the object of which was to induce the plaintiffs, through the use of false statements and omissions of material

fact, to purchase unregistered Smith's Pride stock. The same theories were advanced by plaintiffs as bases for holding Deltec liable under the antifraud provisions of the Securities Act of Alabama, Ala.Code tit. 53, § 45 (1958).

In addition to these pendent state law claims, two other pendent claims were asserted against Deltec. The plaintiffs alleged that the $500,000 Deltec received from the Smith brothers, when they repurchased the stock, was misappropriated by the Smiths from the coffers of Smith's Pride. Deltec, it was alleged, was, therefore, required to hold the money in constructive trust and was accountable to the plaintiffs. Deltec was also said to be liable on the ground that the payments for the stock represented fraudulent or preferential transfers of money from an insolvent debtor in violation of the Alabama Fraudulent Conveyances Act, Ala.Code tit. 20, § 8 (1956).

On January 29, 1974, after substantial discovery by the parties, Deltec and G. L. Smith both moved for summary judgment. Plaintiffs reciprocated with a like motion. On November 26, 1974, the district court granted Deltec's motion and denied the others. The court made no findings of fact or conclusions of law in support of its action. On August 27, 1975, plaintiffs moved for leave to amend their amended complaint, and the motion was peremptorily denied. On December 30, 1976, the court made the summary judgment for Deltec final pursuant to Fed.R.Civ.P. 54(b), and from that final judgment the plaintiffs took this appeal.

## II

■ Before we proceed to the merits of the plaintiffs' claims against Deltec, two matters must be addressed: (i) the failure of the district court to consider the certification of this case as a class action pursuant to Fed.R.Civ.P. 23(c)(1) and (ii) the court's rejection of the plaintiffs' motion for leave to file a second amended complaint under

repurchase the remaining shares, at $5.00 per share, and to sue the Smiths for specific performance if the Smiths failed to repurchase them.

Fed.R.Civ.P. 15(a). Rule 23(c)(1) requires class certification "[a]s soon as practicable after the commencement of an action." There is no indication in the record that the parties or the district court ever addressed the certification issue. Without certification, no final decision could be binding on a class such as the one that is purported to exist in this case. We therefore treat this case as one brought by the named plaintiffs individually, not as members of a class. *Shirley v. Chestnut*, 603 F.2d 805, 807 (10th Cir. 1979); *Roberts v. American Airlines, Inc.*, 526 F.2d 757, 762 (7th Cir. 1975), *cert. denied sub nom., Williams v. American Airlines, Inc.*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976); *Jackson v. Lynn*, 506 F.2d 233, 236 (D.C.Cir.1974); *Davis v. Romney*, 490 F.2d 1360, 1366 (3d Cir. 1974).

█ As for plaintiffs' motion for leave to amend the complaint, we think the trial judge was entirely within his discretion in denying it. The motion was filed *nine months* after the court had granted Deltec's motion for summary judgment. It should be remembered that the plaintiffs, as well as Deltec, had moved for a summary disposition of the plaintiffs' claims. That motion amounted to a representation by the moving counsel, as officers of the court, that the case was fully at issue, that all theories of liability and all defenses had been presented, and that the case was ripe for summary treatment. This no doubt explains why the plaintiffs, as the court observed in foreclosing their belated attempt to file a new complaint, could show "no good cause" why their motion for leave to amend should be granted. We likewise find "no good cause" in this record for allowing

the amendment and, consequently, will consider the matter no further. *See In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1162–3 (5th Cir. 1979). We turn, instead, to the merits of the plaintiffs' federal question claims against Deltec.

## III

█ Summary judgment is appropriate only if there is no issue of material fact. *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406 (5th Cir. 1980). We must view the evidence and draw all inferences most favorably to the party resisting the motion in determining whether an issue of material fact is present. The inferences to be drawn, however, are limited by a standard of reasonableness:

> Insofar as any weighing of inferences from given facts is permissible, the task of the court is not to weigh these against each other but rather to cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness, casting aside those which do not meet it and focusing solely on those which do.

*American Telephone and Telegraph Co. v. Delta Communications Corp.*, 590 F.2d 100, 102 (5th Cir.), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). We will "decline to permit blame to be based solely on conjecture in the guise of inference." *Ayers v. Wolfinbarger*, 491 F.2d 8, 16 (5th Cir. 1974).

## A

█ Plaintiffs contend that Deltec is liable under section 12(1) of the Securities Act of 1933[2] because it sold to plaintiffs

---

2. Section 12(1), 15 U.S.C. § 77*l* (1976) provides:

Any person who—

(1) offers or sells a security in violation of section [5] of this title, or

(2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were

made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of *such untruth or omission,*

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the *amount of any income received thereon,*

securities that were not registered as required by law, and under section 12(2) of that act, because Deltec made false and fraudulent statements regarding material facts, which induced the plaintiffs to purchase these securities.[3] Section 12(1) states that anyone who sells an unregistered security *"shall be liable* to the person purchasing such security from him . . . ." (Emphasis added.) Section 12(1) is thus, by its terms, a strict liability statute. To recover, a plaintiff need show only the jurisdictional use of mails or interstate commerce,[4] the lack of the required registration, and the sale of a security by the defendant. In this case, the first two elements of a section 12(1) cause of action were satisfied; the sale of a security by Deltec to a plaintiff is the only element remaining in issue.

A purchaser proceeding under section 12(2) must show, in addition to the jurisdictional use of an instrumentality in interstate commerce, the seller's violation of the section's antifraud provisions. Since the jurisdictional and fraud elements of plaintiffs' section 12(2) claim have been made out, the issue before us on this claim is the same one presented under section 12(1): whether Deltec sold any of the securities to plaintiffs.

No plaintiff in this case acquired his Smith's Pride stock directly from Deltec. All the shares were purchased from W. L. Smith; that is, Smith was the person from whom title passed. Whenever stock was sold to a plaintiff, Smith surrendered to Smith's Pride the shares he had sold; the company then issued a new stock certificate to the purchaser.[5]

Though it is undisputed that Deltec did not transfer title to any of the plaintiffs' stock, the inquiry—was Deltec a seller—is not at an end. The inquiry is still open because the definition of "seller" has been judicially expanded. Courts have recognized that in complex securities transactions the true seller is not necessarily the person who transfers title, so other participants in the sale can, also, be treated as sellers. This definition of seller has broadened slowly and cautiously, however, because of the strict liability prescribed.[6] *See* 3 A. Bromberg & L. Lowenfels, Securities Fraud, Commodities Fraud Sec. 310–319, pp. 206.3–206.8 (1979).

In *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971), we had the occasion to formulate a definition, or test, for identifying those

upon the tender of such security, or for damages if he no longer owns the security.

3. Section 5, 15 U.S.C. § 77e (1976), requires a stock to be registered with the SEC before sales of that stock can be made to public investors unless the stock is exempt under section 3, 15 U.S.C. § 77c, or the transaction is exempt under section 4, 15 U.S.C. § 77d. The burden of proving an exemption is on the party seeking protection from section 5. *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971). In this case, Deltec has admitted that the stock sold plaintiffs was required to be registered under section 5.

4. Section 12(1) requires only a violation of section 5 and the sale of securities by the defendant. Section 5 makes it unlawful for any person to sell a security in interstate commerce or through the mails unless it is registered. Therefore, to show a violation of section 5, a plaintiff must prove use of interstate commerce or the mails and lack of registration.

5. The shares Smith sold the plaintiffs came either from the shares initially issued to him by Smith's Pride or from the shares he sold to and

subsequently repurchased from Deltec under the settlement agreement.

6. Though the cases and the commentators interpret sections 12(1) and (2) as strict liability statutes, a plausible argument can be made that the latter statute is not. In *Hill York v. American International Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971), we hinted at this argument, but did not address it. *See* note 7, *infra*. Section 12(2), unlike section 12(1), would relieve a seller who sustains "the burden of proof that he did not know, and in the exercise of reasonable care could not have known," of the violation of the statute's antifraud provision. Section 12(1) however, would impose liability on a person regardless of his knowledge that unregistered securities may have been sold. The precise question the *Hill York* panel declined to consider is whether the definition of a section 12(1) seller should be tempered by the policy against broadening the scope of a strict liability statute to include persons not clearly within its intended reach.

beyond the plaintiffs' immediate seller, who might be subject to section 12 liability. The defendants in *Hill York* devised a plan to sell restaurant franchises through corporations to be established by them in defined geographic areas. The defendants found local investors to form these corporations and to serve as officers and directors thereof. Each corporation had five directors, and the defendants were given the power to elect two of them. Once formed, a corporation purchased from defendants the right to sell the restaurant franchises. The corporation obtained the funds to finance this purchase by selling its own stock. The defendants personally made none of these sales of stock but they assisted in the sales by instructing the corporate officers about solicitation techniques and by providing sales literature. The stock that was sold was not registered, as required, with the SEC.

The *Hill York* plaintiffs, purchasers of the stock, sought to recover against the defendants under section 12(1), since the stock was unregistered, and under section 12(2), because the defendants had misrepresented material facts that led plaintiffs to buy the stock. The district court treated the defendants as sellers, though they were not in privity with the purchasers, and we affirmed its judgment rescinding the stock transactions. We concluded that the defendants had been so involved in the plaintiffs' transactions as to be included within those persons Congress intended to make strictly liable. To support our conclusion, we fashioned a definition of the term "seller" and then explained why the defendants fell within it:

> Although the term "seller" has sometimes been accorded a broader construction under Section 12(2) than under Section 12(1), we adopt a test which we believe states a rational and workable standard

for imposition of liability under either section. Its base lies between the antiquated "strict privity" concept and the overbroad "participation" concept which would hold all those liable who participated in the events leading up to the transaction. . . . We hold that the proper test is the one previously forged by the court in *Lennerth v. Mendenhall,* [234 F.Supp. 59 (N.D. Ohio 1964)]. " . . . the line of demarcation must be drawn in terms of cause and effect: To borrow a phrase from the law of negligence, did the injury to the plaintiff flow directly and proximately from the actions of this particular defendant?"

448 F.2d 692–93 (citations and footnotes omitted).[7] The *Hill York* defendants fell within this definition of "seller" because their actions were the motivating force behind the security sales in question. They trained those who actually made the sales and provided the promotional literature, including the misleading information, communicated to the plaintiffs. "In fact, the defendants did everything but effectuate the actual sale[s]." Finally, we opined that "The hunter who seduces the prey and leads it to the trap he has set is no less guilty than the hunter whose hand springs the snare." *Id.* at 693.

We have been called upon only once since *Hill York* to determine whether one not in privity with a security purchaser should be held accountable as a section 12 seller. In *Lewis v. Walston & Co.*, 487 F.2d 617 (5th Cir. 1973), a registered representative of the Walston & Co. brokerage firm touted the stock of Allied Automation, Inc. to the plaintiffs, notified them when Allied stock became available for purchase, and, then, arranged the plaintiffs' purchase of some stock from Allied. The securities had not

---

**7.** Although this quotation states that the definition of "seller" is the same for sections 12(1) and (2), the panel, in a footnote, intimated, *without explanation,* that it might be appropriate to broaden the definition in future section 12(2) cases. 448 F.2d at 695–96 n.24. It was unnecessary, of course, for the panel to consider the matter because it was satisfied that *the defendants were sellers under the arguably*

narrower section 12(1) definition. *See* note 4 *supra.* In *Lewis v. Walston & Co.*, 487 F.2d 617 (5th Cir. 1973), this court again addressed the question who is a section 12 seller, but gave no indication that the word "seller" might be given a different reading under sections 12(1) and (2). We, therefore, apply the same definition to both sections in this appeal. See text *infra.*

been registered. In a sections 12(1) and (2) suit in district court, the plaintiffs established that false statements had been made by the Walston representative to induce them to purchase the unregistered stock and obtained a $70,000 jury verdict against the representative and her principal, Walston. In affirming the judgment against the registered representative, we noted that section 12 sellers have been held to include "parties [other than the party who passes title] who participate in the negotiations of or arrangements for the sale of unregistered securities [and] . . . parties responsible for bringing about sales of securities . . . ." *Id.* at 621. We then recast the *Hill York* "proximate cause" test as follows: were the defendant's actions "a 'substantial factor' in bringing about the plaintiffs' purchases." *Id.* at 622. Applying that test, we did not hesitate to find that the representative's action in touting the Allied stock and setting the stage for the plaintiffs' acquisition of the stock was "'substantial factor' in bringing about" that transaction.

■ We read *Hill York* and *Lewis* as limiting sections 12(1) and (2) sellers (i) to those in privity with the purchaser and (ii) to those whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place. Mere participation in the events leading up to the transaction is not enough. But beyond the words "substantial factor," we have no guideposts other than the factual situations presented in these two cases to assist us in determining whether to impose strict liability in a given case.[8] Accordingly, we shall examine the salient facts before us to determine whether an analogy with *Hill York* or *Lewis* exists.

■ Deltec could not have played a substantial or integral role in the September 10, 1968, sale of 10,000 shares to plaintiff

Sam Virciglio or any other sale prior to the October 3, 1968, settlement of Deltec's lawsuit against the Smiths in the district court. There is simply not a shred of evidence that Deltec did anything to bring the Virciglio sale about. If anything, Deltec's action in pressing forward with its suit, which had been pending against the Smiths in Birmingham for several months, should have had a chilling effect on the Virciglio sale and any others that may have been in the works at that time.

Deltec's position vis-á-vis the Smiths and Smith's Pride changed dramatically, of course, when the settlement was reached and Deltec became a Smith's Pride shareholder. The plaintiffs observe, correctly, that, once a shareholder, Deltec may have had a motive to encourage sales of Smith's Pride stock, especially shares owned by the Smith brothers, since such sales might have provided the Smiths with funds to repay the $500,000 they owed Deltec. Deltec was naturally looking for satisfaction of its debt. It had, earlier, rejected a $250,000 cash settlement offer from the Smiths and fully expected to receive the entire $500,000 through the monthly payments called for by the October 3 agreement. As for the sale of Smith's Pride stock, however, it is clear that all that Deltec contemplated was that the Smiths would go forward with the public offering of registered stock to be underwritten by Andresen.

Plaintiffs point to no evidence indicating that Deltec eventually learned that the Smith's had been cutting in a few of their good friends and customers on the anticipated public offering bonanza by letting them buy some of the company's stock. One reason for the lack of such evidence, perhaps, is that these private sales were deliberately kept quiet; the sales were being made only to a limited number of people because the Smiths had been advised that

---

8. The "substantial factor" requirement of *Lewis* has precedential support. Professor Bromberg has observed that the section 12(2) cases suggest that "participation must be 'substantial' . . . [and] must '[play] an integral role in the fraud charged,' *Sprayregen v. Livingston Oil Co.,* 295 F.Supp. 1376, 1378, . .

(S.D.N.Y.)," before one can be deemed a seller. Though Bromberg makes no observations at all about the degree of participation necessary for liability as a section 12(1) seller, in view of the strict liability nature of section 12(1) we think the degree of participation could be no less than that required under section 12(2).

widespread selling would lead to a violation of the securities laws. Another reason Deltec may not have been shown to have had knowledge of these private sales lies in the extreme care the Smiths and their underwriter took to ensure that Deltec would not sell *any* of its 100,000 shares of Smith's Pride stock except to the Smiths without first complying with the SEC registration requirements. Were Deltec to have sold any of its shares to third parties without registration, it is probable that the public offering would have been jeopardized. In addition to requiring Deltec to comply with the federal securities laws, the Smiths agreed to a like condition for themselves. The October 3 settlement agreement therefore forbade the Smiths from selling any of the stock they repurchased from Deltec without satisfying the SEC registration requirements. Consequently, the certificate of every repurchased share bore a legend indicating that restriction.

All that the plaintiffs proof established, for summary judgment purposes, was that Deltec should have surmised that the monthly checks it was receiving from the Smiths, as they bought back their 100,000 shares of stock, might have been funded by the proceeds of sales of Smith's Pride securities. From that proof it should be inferred, plaintiffs submit, that Deltec, having been alerted, could have investigated the situation and presumably learned the truth—that sales of stock, not registered as required by the federal securities laws, were being made by the Smiths or their company. And having, finally, discovered the truth, Deltec would have been duty bound to intervene in an effort to stop the sales. In sum, Deltec's failure to uncover those sales, when it should have suspected that they were taking place, is said to have been a substantial causative factor in the execution of those sales.

The facts in this case are not analogous to those in *Hill York* or *Lewis*. Moreover, in the face of the substantial causative factor test laid down by those cases, we consider plaintiffs' reasoning sophistic. Whatever inferences one might construct from the evidence of Deltec's conduct, the proof falls woefully short of demonstrating that Deltec played a substantial or integral role in bringing about the sales to plaintiffs. Their claims that Deltec was a section 12(1) or (2) seller because it "participated" in the sales to plaintiffs are, therefore, without merit.

■ The plaintiffs advance two other theories for holding Deltec potentially liable as a seller under section 12(1) or (2). The first is that Deltec was a member of a conspiracy, in which one or more of the coconspirators were sellers, formed for the purpose of violating section 12. The second is that Deltec aided and abetted one or more sellers liable under section 12. We consider these theories in order.

The conspiracy, according to the plaintiffs, was formed in July or August 1968 by the Smiths, W. M. Wright, and Smith's Pride. Deltec is said to have joined the conspiracy on October 3, when it settled its litigation with the Smiths and became a Smith's Pride stockholder. Thereafter, the original conspirators, all established sellers, resumed pursuit of the conspiratorial objectives by making the sales complained of, except, of course, the sale to Virciglio which had occurred earlier.

The plaintiffs cite no authority for the proposition that a member of a conspiracy to violate section 12 becomes liable as a seller whenever one of his coconspirators makes a sale condemned by the statute. To our knowledge, no court has confronted the issue straightforwardly. 3 A. Bromberg & L. Lowenfelds, *Securities Fraud & Commodities Fraud*, sec. 8.5 (317), p 206.8 (1979). We were presented with the conspiracy theory on one occasion, in *Sorenson v. Elrod*, 286 F.2d 72 (5th Cir. 1960). The case was bench tried on the conspiracy theory; the district court, on the evidence, found no conspiracy, and we upheld the court's finding. Because there was evidence to support the district court's finding, it was unnecessary for this court to reach the question whether a conspirator can be a section 12 seller, and, therefore, that question went unanswered.

We again defer the question to another day, because we find, as a matter of law, that Deltec was not a member of the conspiracy charged. The facts that lead us to conclude, *supra*, that Deltec was not a seller under the *Hill York-Lewis* test require us to hold that Deltec was not a conspirator. In applying that test, we said that the evidence was insufficient to make out a jury issue because it indicated only that Deltec should have surmised that the funds utilized by the Smith brothers to regain their stock came from the proceeds of transactions in Smith's Pride stock. Even if it had been shown that Deltec suspected that unregistered Smith's Pride stock was being sold in violation of section 12(1) or section 12(2)'s antifraud prescriptions and yet made no objection, Deltec could not have been held liable as a conspirator. Prosser, Law of Torts, 4th ed. 1971, 292. That is because a conspirator, to be found responsible, must have intended the object of the conspiracy—in this case the violation of section 12—and the evidence was insufficient to show that Deltec possessed such an intent.

The Restatement of Torts affords the plaintiffs no comfort. When a defendant is alleged to have acted in concert with another, he is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979). Clause (a) embraces conspiracies; there was none here, involving Deltec, as we have shown. Clause (b)'s "substantial assistance or encouragement" requirement is akin to the *Hill York-Lewis* standard we have explicated, and, again, no prima facie case was made out against Deltec. Clause (c)'s

test of liability falls within the scope of the *Hill York-Lewis* standard that plaintiffs failed to meet; thus, clause (c) likewise furnishes no basis for liability. In sum, plaintiffs' conspiracy theory was plainly insufficient to survive a summary judgment motion.

We turn, then, to the aider and abettor theory of section 12 liability. The plaintiffs, again, cite no authority in support of the proposition that an aider and abettor is a seller within the intendment of section 12, and we have found none. Professor Bromberg indicates that no court has defined seller in terms of aiding and abetting. Bromberg *supra* at sec. 8.5(316), p. 206.8. The plaintiffs suggest, however, that our opinion in *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975), supports their theory. *Woodward* is inapposite. The question there was whether an aider and abettor was within the class of defendants Congress intended to reach under section 10(b) of the Exchange Act, 15 U.S.C. § 78*j*(b) (1976), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1979); the definition of a section 12 seller was not involved.

A participant in a sale of stock that transgresses section 12 could be an aider and abettor, as defined at common law, *see* Restatement (Second) of Torts § 876(b) (1979). The panel in *Hill York* was faced with fashioning a test for determining which participants, out of the universe of possible participants, in a section 12 sale should be subjected to liability as sellers. A test was developed and, as augmented by *Lewis*, states the law of this circuit. In finding, under that test, that Deltec's participation in plaintiffs transactions was insufficient to incur section 12 liability, we have in effect found that Deltec could have no liability as an aider and abettor.

## B

Plaintiffs submit that if Deltec is not liable as a "seller" under section 12, it is liable as a "controlling party." Section 15 of the Securities Act, 15 U.S.C. § 77*o*

(1976),[9] makes a party, who controls a section 12(1) or (2) seller, jointly and severally liable with that seller for the seller's violation of section 12. Plaintiffs alleged, and established for summary judgment purposes, that the Smiths, W. M. Wright and Smith's Pride are section 12 sellers since they caused plaintiffs to purchase unregistered Smith's Pride stock by misrepresenting various material facts. The question before us, therefore, is whether Deltec "controlled" these sellers.

The Securities and Exchange Commission has defined "control" as follows:

> The term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 230.405(f) (1979). Plaintiffs contend that Deltec's ownership of 100,000 shares of Smith's Pride stock gave Deltec the power to control the corporation's management, the Smiths and Wright, and thus the corporation itself. This contention borders on the frivolous. When Deltec acquired its stock on October 3, 1968, there were approximately 1,100,000 shares of Smith's Pride stock issued and outstanding; Deltec thus acquired less than a 10 percent interest in the company. On November 1, 1968, when the Smiths' repurchase obligation under the settlement agreement took effect, Deltec's stock interest in the company began to diminish at the rate of 8,000 shares per month. By the time plaintiffs Weeks and Hollis bought their shares in April 1969, Deltec's interest had been cut almost in half.

Throughout the time Deltec was a Smith's Pride shareholder, the Smiths owned well in excess of 50 percent of the company's issued and outstanding stock, constituted the majority of its board of directors, and executed the management function. Deltec had no representatives on Smith's Pride's board or on its management team. It is quite obvious, then, that Deltec did not have the power to control Smith's Pride's management, or the company.

Though Deltec's power to control through stock ownership may not have been shown, plaintiffs insist that Deltec nevertheless had a contract obligation to control the distribution of the unregistered Smith's Pride stock. The plaintiffs point to the October 3 settlement agreement between Deltec and the two Smith brothers and an agreement executed contemporaneously between Deltec and Smith's Pride, relating to Smith's Pride's planned public offering, as having imposed the obligation on Deltec to control any future distribution of Smith's Pride stock. The plain language of those contracts, however, indicates that Deltec neither undertook the obligation nor acquired the power to effect such control.

The settlement agreement contains the following recital:

> "WHEREAS, the Smiths have represented to [Deltec] that [Smith's Pride] . . intends to make a public offering of approximately 150,000 shares of its common stock in, to wit, December 1968, in accordance with regulations of the Securities and Exchange Commission and that [Smith's Pride] is presently engaged in negotiations with Andresen and Company, Incorporated, as prospective underwriters of the said public offering and that the Smiths have good reason to believe that the shares will be offered to the public at the price of $6.00 per share . . . . ."

**9.** Section 77o states:

Liability of controlling persons

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [section 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

Record at 1676. The contemporaneous agreement between Deltec and Smith's Pride contains a similar recital: "WHEREAS, Smith's Pride is negotiating with Andresen and Company, Incorporated, as prospective underwriters looking toward a public offering of stock of Smith's Pride following a registration thereof with the Securities and Exchange Commission . . . ." Record at 1672. A fair reading of the two agreements leads, in our view, to only one conclusion: none of the parties contemplated that Deltec would play any role in taking the Smith's Pride stock to market.

When Deltec accepted the 100,000 shares from the Smiths as part of the settlement, it promised that it would not sell any of those shares, except to the Smiths, without complying with the SEC's registration requirements. The Smiths made a reciprocal promise with respect to any of the shares it might buy back from Deltec. In the event Deltec elected to sell all or a part of its 100,000 shares to someone other than the Smith brothers, thus triggering the SEC registration requirements, Smith's Pride was obligated to prepare and file, at Deltec's expense, the necessary registration statement with the SEC.

We are unable to read into the language of these two settlement documents any undertaking on Deltec's part to control the future disposition of Smith's Pride stock. Nor can we find in them any indication that the power to control such disposition was conferred on Deltec. Deltec's contract rights, and obligations, were limited. Deltec could require Smith's Pride to register Deltec's stock in the event it desired to sell the stock to third parties, and it had the implied right to place on the certificates of any shares it sold back to the Smiths a legend indicating that the shares were restricted. The legend was affixed to each such certificate. Once Deltec transmitted these certificates to the Smiths, it certainly had no duty to police the Smiths' activities to determine whether they were standing by their promise not to sell the shares in

violation of the federal securities laws. Under these circumstances, we can say as a matter of law that Deltec was not a control party within the meaning of section 15. *See Strong v. France,* 474 F.2d 747, 752 (9th Cir. 1973); *Stern v. American Bankshares Corp.,* 429 F.Supp. 818, 824 (E.D.Wis.1977); *Ferland v. Orange Groves of Florida, Inc.,* 377 F.Supp. 690, 707 (M.D.Fla.1974).

### C

Plaintiffs also seek to impose liability on Deltec as an underwriter, citing section 2(11) of the Securities Act, 15 U.S.C. § 77*b*(11) (1979). Section 2(11) defines an underwriter, but it does not define unlawful conduct or create any liability for a person who is an underwriter. Accordingly, plaintiffs must predicate Deltec's liability as an underwriter on another provision of the Securities Act. The only provisions of that act that create liability are sections 11[10], 12 and 15. We have held that Deltec is not liable under sections 12 or 15, and plaintiffs have not invoked section 11 as a basis for liability. Since there was no foundation for plaintiffs' "underwriter" claim, the district court was correct in summarily disposing of it.

### D

Section 10(b) of the Exchange Act, 15 U.S.C. § 78*j*(b) (1979) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in

---

**10.** 15 U.S.C. § 77K(a)(5) (1976). Section 11(a)(5) provides that any person who purchases a security, which was subject to a registra- tion statement containing a false statement, may sue "every underwriter with respect to such security."

the public interest or for the protection of investors.

The plaintiffs allege that Deltec violated Section 10(b), and therefore is answerable to them in damages, because Deltec, directly or indirectly, used or employed, in connection with the sale of Smith's Pride stock to plaintiffs, a deceptive device in contravention of Rule 10b–5, 17 C.F.R. § 240.-10b–5 (1979), promulgated by the SEC. Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

 For purposes of this appeal, it is conceded that the Smiths, Wright, and Smith's Pride, in connection with the sale of Smith's Pride stock to plaintiffs, committed acts which operated as a fraud upon the plaintiffs; they induced the plaintiffs to buy the security by making false and misleading statements of material fact. Since these defendants also utilized instrumentalities in interstate commerce, a prima facie rule 10b–5 cause of action was established. *See Cameron v. Outdoor Resorts of America, Inc.,* 608 F.2d 187 (5th Cir. 1979) *modified on other grounds,* 611 F.2d 105 (5th Cir. 1980). Plaintiffs advance several theories in contending that Deltec, as well, infringed rule 10b–5: (1) Deltec, itself, engaged in acts which operated as fraud on the plaintiffs; (2) Deltec was in a conspiracy with one or more of these other defendants who,

in pursuing the object of the conspiracy, engaged in such acts; (3) Deltec aided and abetted one or more other defendants who engaged in such acts; and (4) Deltec controlled one or more other defendants who engaged in such acts. In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that a plaintiff in a private damage action under rule 10b–5 must prove that the defendant acted with intent to defraud, *i. e.,* scienter. *Steadman v. SEC,* 603 F.2d 1126, 1131–32 (5th Cir. 1979), *cert. granted,* —— U.S. ——, 100 S.Ct. 1849, 64 L.Ed.2d 271 (1980). We are convinced that the evidence, here, fails to permit the inference that Deltec intended to defraud, by affirmative act or inaction, any plaintiff in this case under any rule 10b–5 theory the plaintiffs have presented.

In our discussion of section 12 of the Securities Act, we observed that the evidence showed, at best, that Deltec should have surmised that the Smith brothers were able to buy back their 100,000 shares because they were either peddling their own Smith's Pride stock or were obtaining money from the company by selling unissued shares and keeping the proceeds for themselves. This was not enough, we concluded, to demonstrate an intent on Deltec's part to deceive the plaintiffs within the meaning of section 12(2), which is, like rule 10b–5, an antifraud provision.

The same evidence cannot suffice to establish intent to defraud under *Hochfelder.* It does not matter, moreover, whether the operative acts are claimed to be Deltec's or those of someone acting in concert with Deltec—Deltec must have possessed the intent to defraud. The plaintiffs' suggestion that scienter is not required to make out a rule 10b–5 case against an aider and abettor is, also, foreclosed by *Hochfelder,* since the plaintiffs there sought to hold the auditors, Ernst & Ernst, liable as aiders and abettors.

 Plaintiffs' controlling party theory of recovery is drawn from section 20(a) of the Exchange Act, 15 U.S.C. 78*t* (a) (1979).[11]

---

11. Section 20(a), 15 U.S.C. § 78*t* (a) (1976), provides:

(a) Every person who, directly or indirectly, controls any person liable under any pro-

They claim that a prima facie case has been presented that Deltec controlled one or more of the other defendants, the Smiths, Wright, or Smith's Pride, who violated rule 10b–5; consequently, Deltec is amenable to suit under section 20. Section 20(a) is an analogue of section 15 of the Securities Act. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2nd Cir. 1975). Therefore, we give the two sections the same interpretation. In analyzing the evidence to determine whether Deltec was a controlling party under section 15, we came to the conclusion that Deltec was never in control by virtue of its equity interest in Smith's Pride. We also concluded that the agreements made by Deltec, the Smith brothers, and Smith's Pride on October 3, 1968, conferred on Deltec no power to control the disposition of Smith's Pride stock by others. Because sections 15 and 20 are analogous, the conclusion we reached on plaintiffs' claim that Deltec controlled a section 12 violator must apply to their claim that Deltec controlled those who violated rule 10b–5. Accordingly, the district court's summary disposition of the rule 10b–5 cause of action was appropriate.

### E

The plaintiffs' final federal claim is that Deltec is liable under section 17(a) of the Securities Act, 15 U.S.C. § 77q (1976). This statute, which served as the model for Rule 10b–5, makes unlawful three types of activities:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q (1976).

Plaintiffs contend that Deltec transgressed section 17(a) because Deltec, directly or indirectly, in the sale of stock to plaintiffs, (1) obtained money from them by means of fraud or (2) engaged in a transaction that operated as a fraud. A prima facie case is, concededly, established against the Smiths, Smith's Pride, and W. L. Wright. The plaintiffs seek to hold Deltec liable under some of the same theories they advanced to support their section 10(b) cause of action: Deltec either obtained money by means of fraudulent acts of its own, or it participated in a transaction, as a coconspirator or aider and abettor, that operated as a fraud. Before proceeding to the merits of plaintiffs' contentions, however, we must take note of an issue that neither of the parties has raised—whether a private cause of action for damages may be maintained under section 17(a).

Such a cause of action is not expressly provided for by the Securities Act, and we have never squarely held that one exists. When liability has been sought under section 17(a), we have reserved consideration of the question by finding that the plaintiffs' right to recover damages was firmly established in the case under section 10(b), thereby eliminating the need to consider whether section 17(a) also supported the recovery, or by holding that the plaintiff did not show an infraction of section 17(a) by the defendant. *See, e. g., National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295 (5th Cir. 1978). It has been observed that Congress, in ex-

vision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless

the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

plicitly providing a well-conceived scheme of liability in the Securities Act, indicated that there was no legislative intent to imply a section 17(a) private damages action, *see* 3 *L. Loss Securities Regulation* 1784–90 (1961). Nevertheless, we once again find it unnecessary to resolve this issue because we find that the plaintiffs have no section 17(a) claim on the most favorable construction of the record before us.

First, Deltec neither obtained any money by means of an untrue statement it uttered nor engaged in a securities transaction that operated as a fraud. Any fraudulent statements made to induce the stock purchases were uttered by the Smiths or Wright. Thus, any liability of Deltec must hinge on its association with these other defendants.

The plaintiffs state that their conspiracy and aider and abettor arguments are stronger under section 17(a) than under section 10(b) and rule 10b–5 because scienter is not a necessary element of a cause of action under subsections (2) and (3) of section 17(a). *Aaron v. SEC,* —— U.S. ——, ——, 100 S.Ct. 1945, 1955–1956, 64 L.Ed. 611 (1980); *Steadman v. SEC,* 603 F.2d 1126, 1131–34 (5th Cir. 1979), *cert. granted,* —— U.S. ——, 100 S.Ct. 1849, 64 L.Ed.2d 271 (1980). While it is true that *Steadman* holds that scienter is not required when the SEC proceeds under section 17(a)(2) and (3), it obviously does not abolish scienter as an element of a private damages action against a conspirator or aider and abettor, if such an action exists at all—a question the *Steadman* panel was not called upon to answer.

If such a cause of action is maintainable for conspiring to violate or aiding and abetting a violation of section 17, we think the same principles that would govern the prosecution of a similar claim under section 12

of the Securities Act or section 10(b) and rule 10b–5 would apply. Thus, what we have said in disposing of the plaintiffs' claims under these antifraud provisions requires us to reject their conspiracy and aiding and abetting theories under section 17(a).

## IV

■ In granting summary judgment, the district court made no findings of fact or conclusions of law;[12] nor did it state the reasons for its action. We cannot determine, therefore, whether the court ruled on the merits of the plaintiffs' pendent state-law claims. For the reasons stated below, we conclude that the pendent claims were dismissed without prejudice after the court disposed of the federal claims on the merits, and we hold that the trial judge's action in dismissing the pendent claims without prejudice was not an abuse of discretion.

In *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) the Supreme Court counselled against a federal court's retention of pendent state-law claims when there has been a pre-trial disposition of the federal claims.

Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Id.* at 726, 86 S.Ct. at 1139 (footnotes omitted). We have followed this teaching in declaring it within the discretion of our district courts to dismiss these pendent claims without prejudice when the federal claims are dismissed before trial. *Daniels*

12. The order of the district court stated:

This cause came on to be heard upon motion of the defendant Deltec International Limited for summary judgment in accordance with Rule 56, Federal Rules of Civil Procedure, on the ground that the complaint fails to raise an issue as to any material fact respecting this defendant's alleged liability. The court has considered the motion, togeth-

er with the pleadings and the affidavits filed herein, and is of the opinion that said motion for summary judgment is due to be granted.

Accordingly, it is ORDERED, ADJUDGED and DECREED that the motion of defendant Deltec International Limited for summary judgment be, and the same hereby is, granted in favor of said defendant.

Record at 1691.

*v. All Steel Equipment, Inc.*, 590 F.2d 111 (5th Cir. 1979); *Scranton Construction Co. v. Litton Industries Leasing Corp.*, 494 F.2d 778 (5th Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975).

In *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the Supreme Court held that the trial court's discretion over the administration of pendent claims is broad enough to allow the court to proceed with a pendent claim after the federal cause of action is mooted. In *Rosado*, substantial time and energy had been expended, and the state law issue was "essentially one 'of federal policy [where] the argument for exercise of pendent jurisdiction is particularly strong.'" *Id.* at 403–404, 90 S.Ct. at 1213, *quoting United Mine Workers v. Gibbs*, 383 U.S. at 727, 86 S.Ct. at 1139. Thus, where the federal jurisdictional base is lost after trial or after a substantial part of the case has been completed, the trial court may still retain a pendent state-law claim. *Florida East Coast Railroad v. United States*, 519 F.2d 1184 (5th Cir. 1975). Here, of course, we do not know whether the trial court retained jurisdiction and decided the state claims on the merits, or whether it dismissed them after adjudicating the federal claims.

We think our course of action is dictated by two recent decisions of this court, *Bova v. Pipefitters & Plumbers Local 60*, 554 F.2d 226 (5th Cir. 1977), and *Reid v. Hughes*, 578 F.2d 634 (5th Cir. 1978). In *Bova*, the district court dismissed the plaintiffs' complaint, which contained both federal and pendent claims, without stating any reasons. On appeal, we concluded that, as to the federal claims, the complaint failed to state a claim on which relief could be granted. Without addressing the state law issues, we held: "Diversity of citizenship being absent, . . . the district court did not err in dismissing the entire complaint against the . . . [defendants] without regard to whether Bova had a viable state law claim." 554 F.2d at 228. The district court in *Reid* perfunctorily dismissed a complaint containing both federal and state securities law claims. We affirmed the dismissal, treating the federal claims on the merits. We considered the state-law claims to have been dismissed without prejudice, however:

> In affirming the district court's dismissal, we are of course in no way rendering an opinion on the merits of the plaintiff's claim. From the record before us, it appears that the plaintiff has set forth a legally sufficient corporate mismanagement case against the defendants. This type of cause of action, however, is of the type traditionally assigned to state courts . . . . .

578 at 639. In the case before us, we consider the district court's summary disposal of plaintiffs' state-law causes of action to have been without prejudice, an action well within the court's authority under the circumstances.

In summary, the plaintiffs' claims under the federal securities laws were properly disposed of on the motion for summary judgment, as those claims lack merit. The plaintiffs are free to pursue their causes of action under Alabama law in state court.

The judgment of the district court is, accordingly, AFFIRMED.