## In Re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION

**MARK NEWBY, et al., Plaintiffs**

v.

**ENRON CORPORATION, et al., Defendants**

**The Regents of the University of California, et al., Individually and On Behalf of All Others Similarly Situated, Plaintiffs,**

v.

**Kenneth L. Lay, et al., Defendants.**

**No. MDL–1446, CIV.A. H–01–3624.**

United States District Court, S.D. Texas, Houston Division.

Nov. 30, 2006.

Mark Kirsch, Jim Moyle, Joel M. Cohen, Jason D'Angelo, Guy Quinlan, Angelique Shingler, Clifford Chance US LLP, New York City, Ron Cook, Cook & Roach, LLP, Houston, TX, for Alliance Capital Management, L.P.

## OPINION AND ORDER OF SUMMARY JUDGMENT

HARMON, District Judge.

Pending before the Court in the above referenced cause is Defendant Alliance Capital Management, L.P.'s [1] ("Alliance's") motion for summary judgment (instrument # 4715), pursuant to Federal Rule of Civil Procedure 56, and for attorney's fees and costs under Section 11(e) of the Securities Act of 1933, 15 U.S.C. § 77k(e), on the ground that Plaintiffs' claim against Alliance is not only lacking evidentiary support, but "frivolous, without merit, and/or brought in bad faith."

1. Defendant in now known as AllianceBernstein L.P.

### Plaintiffs' Allegations

The allegations relating to Alliance and Savage are contained in ¶ 83(33) of the First Amended Consolidated Complaint (# 1388):

Defendant Frank Savage ("Savage") was a director of Enron from 99 through 01, and was a member of its Finance Committee while he was on the Board. Savage signed the false and misleading Enron Registration Statement filed and effective with the SEC of 6/1/01, which was used to sell the following Enron securities as to which § 11 claims under the 1933 Act are asserted:

7/18/01 $1.9 billion Zero Coupon Convertible Senior Notes due 2021

Since 95, Savage has been Chairman of Alliance Capital Management International (a division of defendant Alliance Capital Management, L.P.). Savage was also a director of defendant Alliance Capital Management L.P. ("Alliance"), a large financial services company which provides a broad variety of financial and investment management services and owns, operates and markets a series of mutual funds known as Alliance Mutual Funds. During 00–01, Alliance was the largest single institutional shareholder of Enron owning over 43 million shares of Enron stock in Alliance mutual funds.[2] In addition, in its investment management business, Alliance had purchased millions of shares of Enron stock for the account of several of its large institutional investor clients. Alliance (and Savage) had a huge motive to keep Enron stock trading at very high levels. Savage sat on Enron's board to protect Alliance interests and so Alliance would receive the benefits of what Savage learned as a director of Enron and a member of its Finance Committee. Alli-

2. Alliance disputes the allegation that when Savage joined the Enron board on October 12, 1999, Alliance was the largest institutional shareholder of Enron stock. It asserts that as an entity, Alliance, itself, never owned Enron stock, but purchased only a small amount on behalf of its clients: specifically in September 30, 1999, its clients owned approximately 0.23% of Enron's outstanding shares, constituting approximately 0.021% of the total assets managed by Alliance on behalf of its clients; and on October 31, 1999, its clients owned only about 0.23% of Enron's outstanding shares, approximately 0.020% of the total assets managed by Alliance on behalf of its clients. Declaration of Mark R. Andersen (# 4721).

Plaintiffs respond that they did not plead that Alliance was Enron's largest shareholder in 1999, but point out that after Savage sat on the board, Alliance increased its holdings. Plaintiffs argue that this increase was because Alliance now "had a man on the inside." By September 30, 2001, according to Plaintiffs, Alliance owned 43,013,046 Enron shares, supporting a finding of control. # 1388 at ¶¶ 83(ee) and (ff).

The Court observes that Plaintiffs present no evidence for their conclusory allegation that Alliance increased the number of Enron shares it purchased on behalf of its clients because Savage now sat in the Enron board. Moreover, Plaintiffs have not submitted evidence demonstrating that the stock was owned by Alliance as opposed to its clients. Regardless, ownership of Enron stock is irrelevant to the claim here; Plaintiffs have conceded that they are alleging that Alliance had the power to control Savage, not Enron, and stock ownership in Enron does support control of Savage. Moreover, scienter is not an element for nonfraud allegations under § 11 or a derivative claim under § 15, unlike a § 10(b) violation and a derivative § 20(a) claim, which the Fifth Circuit has concluded requires at least a showing of recklessness. *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 621 (5th Cir.1993), *cert. denied sub nom. Turnbull v. Home Ins. Co.*, 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945 (5th Cir.1981). Negligence is sufficient for controlling person liability under § 15. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208–09, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Motive is also not an element for a § 15 controlling person claim.

ance controlled and directed Savage in his activities as a director of Enron. A key to keeping Enron's stock high was Enron maintaining its investment grade credit rating and its apparently strong financial condition—which required Enron to constantly raise new capital—an activity which was under the Enron Board's Finance Committee's control. Savage is sued under § 11 of the 1933 Act for the above-referenced securities offering. Alliance is sued as a controlling person of Savage and is liable under §§ 11 and 15 of the 1933 Act.

## Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Initially the movant bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact; the movant may, but is not required to, negate elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Lujan v. National Wildlife Federation,* 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Edwards v. Your Credit, Inc.,* 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof a trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board,* 40 F.3d 698, 712 (5th Cir.1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. " '[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ....' " *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir.1990), *quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.' " *Id., quoting Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505. The Fifth Circuit requires the nonmovant to submit " 'significant probative evidence' " to raise a genuine issue of material fact for trial. *Id., quoting In re Municipal Bond Reporting Antitrust Litig.,* 672 F.2d 436, 440 (5th Cir.1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.,* 799 F.2d 194, 197 (5th Cir.1986). Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board,* 40 F.3d at 713; *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.,* 174 F.3d 636, 644 (5th Cir.1999), *citing Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548, and *Liberty Lobby,* 477 U.S. at 249–

50, 106 S.Ct. 2505.[3] The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Anderson v. Liberty* Lobby, 477 U.S. at 255, 106 S.Ct. 2505; *Clift v. Clift*, 210 F.3d 268, 269 (5th Cir.2000).

## Applicable Law

The sole claim against Alliance is for "control person" liability under Section 15 of the 1933 Act, 15 U.S.C. § 77o, relating to the contents of a registration statement for $1.9 billion in Enron Zero Coupon Notes signed by an Enron independent director, Frank Savage, who was also employed by Alliance at the time [4] and purportedly "controlled" by Alliance.[5]

Section 11, 15 U.S.C. § 77k, allows any person acquiring securities pursuant to an untrue registration statement to sue, *inter alia*, every person who signed it and every person who was a director of the issuer at the time.

Section 15, 15 U.S.C. § 77o, which imposes derivative joint and several liability upon controlling persons for acts violating sections 11 and 12 of the 1933 Act,[6] provides,

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist.

As defined in 17 C.F.R. § 230.405(f), "The term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities,

---

**3.** The court has no obligation to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.1994). Rather the nonmovant must identify evidence in the record and demonstrate how it supports his claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998).

**4.** Alliance presents as undisputed facts that Savage was employed by Alliance from 1993 through 2001, and that Savage also served as a director of Alliance Capital Management Corporation, Alliance's general partner, from 1993 through 2004.

**5.** *See* # 1194 at 64–67, 71–73, and # 1269 at 28–30 for the Court's earlier discussions of control person liability under § 15 and the Fifth Circuit's test.

**6.** Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), imposes deriva-

tive control person liability when a plaintiff controls a violation of § 10(b). Even though the language of the two statutes varies, Sections 15 and 20(a) are construed in the same way by the Fifth Circuit with respect to the meaning of "control." *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 508, 509 and nn. 16 and 17 (5th Cir.1990); *Pharo v. Smith*, 621 F.2d 656, 673 (5th Cir.1980) ("Section 20(a) is an analogue of section 15" and "we give the two sections the same interpretations"), *rev'd in part on other grounds*, 625 F.2d 1226 (5th Cir.1980). Nevertheless the Fifth Circuit has recognized that substantively the affirmative defenses under § 20(a) ("unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action") and § 15 ("unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist") are different. *G.A. Thompson*, 636 F.2d at 958 n. 23.

by contract, or otherwise." *Quoted in G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 957–58 (5th Cir.1981), and in *Abbott v. Equity Group, Inc.,* 2 F.3d 613, 619 (5th Cir.1993), *cert. denied sub nom. Turnbull v. Home Ins. Co.,* 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

As has been true of so many issues in the *Newby* litigation, courts have taken a variety of positions on issues related to controlling person liability under the two statutes. See James Lockhart, J.D., *Liability of Officer, Director, Employee, or other Individual Associated with Seller or Issuer of Securities as "Control Person" under § 15 of Securities Act 15 U.S.C. § 77o) and § 20(a) of Securities Exchange Act (15 U.S.C. § 78t(a)),* 183 A.L.R. Fed. 141 (2006); Loftus C. Carson, II, *The Liability of Controlling Persons Under the Federal Securities Acts,* 72 Notre Dame L.Rev. 263, 266–67 (1997) ("Significantly, ... the federal courts have not been in agreement about the following issues: 1) how to determine when a person is a controlling person within the meaning of sections 15 and 20(a); or 2) how a controlling person, to avoid liability, can satisfy the requirements. Because of the failure of the federal courts to develop uniform, coherent approaches to these two questions, sometimes confusing and frequently questionable results have emerged in cases decided under sections 15 and 20(a)."). Because this Court is bound by Fifth Circuit law, it addresses that standard except on issues where the Fifth Circuit has been silent.

 Even within the Fifth Circuit, the law on the controlling person doctrine is not crystal clear and at times is inconsistent. Under one panel's test, to make a prima facie case of a § 15 violation against Alliance, Plaintiffs must demonstrate that (1) Alliance had actual power or influence over the allegedly controlled person, Frank Savage, and (2) Alliance induced or participated in the alleged violation. *Dennis v. General Imaging, Inc.,* 918 F.2d 496, 509 (5th cir.1990), *citing G.A. Thompson & Co., Inc. v. Partridge,* 636 F.2d 945 958 (5th Cir.1981) ("Neither [17 C.F.R. § 230.405(f)] nor the statute appears to require participation in the wrongful transaction. Fifth Circuit law appears to follow the plain meaning of the statute in this respect.") [7], and *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 688 (5th Cir.1971). *In accord, First Interstate Bank of Denver, N.A. v. Pring,* 969 F.2d 891, 897–98 (10th Cir. 1992) ("[T]he language of the statute causes us to reject those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation.") (citing similar holdings by the Ninth, Eighth, and Fifth Circuit Courts of Appeals), *rev'd in part on other grounds, Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). The Fifth Circuit also does not appear to require a showing that the controlling person actually exercised the power or influence it had over the controlled person, i.e., here that Alliance actually exercised its power or influence over Savage. *Abbott,* 2 F.3d at 620. *See also McNamara v. Bre–X Minerals Ltd.,* 46 F.Supp.2d 628, 635–37 (E.D.Tex. 1999); *Griffin v. GK Intelligent Systems, Inc.,* 87 F.Supp.2d 684, 689 (S.D.Tex.1999). There must be an underlying primary violation of § 11 or § 12 of the 1933 Act by

---

7. The *Abbott* panel commented, "We note that *Dennis* does not accurately reflect our rejection in *Thompson* of a 'culpable participation' requirement. 918 F.2d at 509. We need not resolve this inconsistency, because our holding turns on appellants' failure to establish Home and Ground's power to control Equity." 2 F.3d at 620 n. 18.

the controlled person to sustain a derivative control person claim under § 15. *Dennis*, 918 F.2d at 509. Position or status of the controlling person, alone, does not prove control. *Id.*

One federal district court in the Fifth Circuit has held, "To establish a *prima facie* case of a Section 15 violation, a plaintiff must show that the defendant at least had the power to control the 'controlled person' in the specific transaction that is alleged as a violation . . . ." *In re Paracelsus Corp.*, 6 F.Supp.2d 626, 633 (S.D.Tex.1998)(emphasis added by the Court). *See also McNamara v. Bre–X*, 46 F.Supp.2d at 638 ("It is enough if the defendant had the *ability* to control the conduct in question"; "[T]he Court will find control person liability if the Plaintiffs made a *prima facie* showing that the Defendant in question had the *power* (whether exercised or not) to control the transactions in question and to control the operations of Bre–X in general."). While most of the courts do not specify that in Plaintiffs' *prima facie* case, the control exerted by the controlling person must be over the particular act giving rise to the primary violation by the controlled person, the affirmative defense of 15 U.S.C. § 77o expressly relates to the transaction constituting the primary violation of § 11: "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist."

██ If Plaintiffs meet their burden of proving a *prima facie* case of control, Alliance "may avoid liability by affirmatively proving that [its] supervision was adequate and that [it] did not know of the conduct of the [§ 11] violator nor could [it] reasonably have known of it." *Dennis*, 918 F.2d at 509. Defendant bears the burden of proving this defense. *Hill York Corp. v. American Int'l Franchises, Inc.*, 448 F.2d 680, 695 n. 22 (5th Cir.1971); *G.A. Thompson*, 636 F.2d at 958 n. 23. The Supreme Court has identified the affirmative defenses to § 11 claims as governed by a negligence standard. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208–09 & n. 26, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Thus under the literal language of the statute, defendants asserting an affirmative defense must demonstrate to the Court that they had no actual knowledge of a violation of § 11 by the controlled person nor any reasonable ground to believe (facts and circumstances suggesting) that the controlled person was violating section 11, or if they did, that they nonnegligently attempted to prevent or stop the violation, e.g., reasonably managed, monitored, investigated, and/or attempted to stop the controlled person from violative conduct.[8]

---

**8.** Loftus Carson, in *The Liability of Controlling Persons Under the Federal Securities Acts*, 72 Notre Dame L.Rev. at 298, summarizes about § 15,

[I]n the defense phase of a Section 15 proceeding, the court should focus on what would constitute reasonable conduct by controlling persons given the facts and circumstances they faced during the relevant period surrounding the Securities Act violation by their controlled person. In light of the role played by the controlling person, the context of the violations, and any other pertinent facts and circumstances in evidence, was the person's behavior regarding the controlled person's Securities Act violation negligent? Were the controlling person's actions and reactions within the range of ordinary prudence? After examining the record and drawing appropriate inferences therefrom, can it be concluded that the controlling person failed to anticipate and guard against an unreasonable risk of a Securities Act violation by his controlled person in a manner a reasonable person in his position would. If the answer to these questions is yes, a violation of section 15 of

Section 11(e), 15 U.S.C. § 77k(e), provides in relevant part,

> In any suit under this or any other section of this title the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorney's fees, and if judgment shall be rendered against a party litigant, upon motion of the other party litigant, such costs may be assessed in favor of such party litigant (whether or not such undertaking has been required) if the court believes the suit or the defense to have been without merit, in an amount sufficient to reimburse him for the reasonable expenses incurred by him in connection with such suit, such costs to be taxed in the manner usually provided for taxing of costs in the court in which the suit was heard.

For an award of fees and costs under § 11(e), the district court must make a specific finding that it believes the suit or the defense was without merit. *Oil & Gas Income, Inc. v. Trotter*, 395 F.2d 753, 753 (5th Cir.1968). After the Fifth Circuit had remanded the case for such a finding, the district court found the suit lacked merit:

> Although plaintiff voluntarily dismissed its suit, it did so only after lengthy proceedings in this court and then only when it was required to file a bond in proper form. Defendant Trotter was put to much expense and trouble in defending his suit. Under the circumstances, the award of $3,000.00 for attorney's fees was reasonable.

395 F.2d at 753–54. The Fifth Circuit affirmed, finding the holding was "an exercise of reasonable discretion." *Id.* at 754.

A number of Circuits addressing the issue have concluded that this standard requires "a finding that the claim borders on the frivolous or has been brought in bad faith." *See, e.g., Aid Auto Stores, Inc. v. Cannon*, 525 F.2d 468, 471 (2d Cir.1975),[9] citing inter alia *Stadia Oil & Uranium Co. v. Wheelis*, 251 F.2d 269, 277 (10th Cir.1957). *See also Shaw v. Merritt–Chapman & Scott Corp.*, 554 F.2d 786, 788 (6th Cir.), *cert. denied*, 434 U.S. 852, 98 S.Ct. 167, 54 L.Ed.2d 122 (1977); *Western Federal Corp. v. Erickson*, 739 F.2d 1439, 1444 (9th Cir.1984). The Second Circuit further stated that the "[m]ere failure of a party to present sufficient evidence to support its claims will not in itself warrant a determination of frivolity." *Id.* at 471. Nor does the fact that the moving party prevailed, by itself, justify such an award. *Robert Alan Ins. Agency v. Girard Bank*, No. Civ. a. No. 83–2370, 1987 WL 14858, *1 (E.D.Pa. July 9, 1987), *citing Le Master v. Bull*, 581 F.Supp. 1170, 1173 (E.D.Pa. 1984).

The Second Circuit has observed that unlike "other sections and Rules that expressly provide for the imposition of sanctions against attorneys," section 11(e) does not, and it has concluded that this fact and others indicate this fee-shifting statute "was not intended to authorize an award against the parties' attorney," but only against a "party litigant." *Healey v. Chelsea Resources, Ltd.*, 947 F.2d 611, 624 (2d Cir.1991). It pointed out that the statute provides that the sanctions include "costs" of the litigation, to be taxed in the usual manner; usually, as in 28 U.S.C. § 1927, costs are assessed against the parties. not the attorneys. *Id.* Finally the Second Cir-

---

the Securities Act may well have been established.

9. In concluding, "A discretionary award of attorney's fees under § 11 is appropriate only where the defense advanced is frivolous, with-

out merit, or brought in bad faith", the Fifth Circuit cited *Aid Auto Stores. Johnson v. Yerger*, 612 F.2d 953, 959 (5th Cir.1980). Thus it is reasonable to presume that it adopted the same definition.

cuit concluded that the minimal legislative history of § 11(e) suggests that Congress did not intend to authorize sanctions against attorneys, but only against parties. *Id.* at 624–25. This Court has been unable to find any other Circuit that has adopted this rule; clearly the Fifth Circuit has not. Moreover, it appears to this Court more appropriate that an award of fees and costs under § 11(e) should be borne by counsel: non-attorney clients more likely than not would not have the ability to determine at what point, based on what evidence, an action becomes legally "frivolous," while its licensed counsel should and is held to such a standard.

## Alliance's Motion

Alliance insists that (1) Plaintiffs cannot establish a *prima facie* case under the statute because they cannot show that Alliance had the power to control Savage's action as an outside director of Enron, and that even if they could, (2) they cannot defeat Alliance's affirmative defense under 15 U.S.C. § 77*o* (i.e., that Alliance could not have known the registration statement at issue, when signed by Savage,[10] was false or misleading nor that Alliance had any reasonable ground to believe such.[11] Alliance maintains that since Plaintiffs have failed to, and cannot, show that Alliance had the power to control Savage, the Court need not reach the question whether Alliance exercised such power.[12]

Alliance contends that during Savage's deposition (excerpts attached as exhibits to # 4718, Declaration of Jason A. D'Angelo, Esq.),[13] noticed in Savage's capacity as a former director of Enron, not as an Alliance employee,[14] Savage testified unequivocally that Alliance did not control his Enron activities, did not place him on Enron's board, had nothing to do with his role as an Enron director or with his decision to sign the registration statement at issue, and that he had never discussed the registration statement with anyone at Alliance. Although it is not required to produce any evidence, Alliance has submitted sworn declarations of two prior Alliance Chairman (Dave H. Williams (# 4719) and Bruce W. Calvert (# 4720)), to whom Savage reported at Alliance, and a statement of un-

---

**10.** In actuality, around May 31, 2001, Savage signed a power of attorney authorizing others at Enron to sign the registration statement on Savage's behalf.

**11.** Alliance points out that this Court previously denied Alliance's motion to dismiss, but observed that the allegations against it "appear somewhat speculative" and stated that "Alliance's objections may more appropriately be raised on summary judgment after discovery." *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 258 F.Supp.2d 576, 648–49 (S.D.Tex.2003).

**12.** As noted *supra,* the Fifth Circuit does not require such a showing.

**13.** Alliance states that Savage's deposition constitutes essentially all of the discovery by Plaintiffs on their claim because no other current or former Alliance employee was noticed for deposition, no interrogatories or re- quests to admit were served on Alliance, and there was only one document demand.

**14.** Plaintiffs objects to Alliance's claim that they did not make a strong effort to discover facts supporting their claim and points out that Lead Plaintiff's Predesignation of Documents for Deposition of Frank Savage identifies the Zero Coupon notes offering as a topic and numerous Alliance documents as potential deposition exhibits. Ex. 22. Counsel also questioned Savage substantially about Alliance's control over him as an Enron director. Ex. 1. In addition to deposing Savage in *Newby,* counsel reviewed his testimony to the Enron Bankruptcy Examiner and in *The Florida State Board of Administration v. Alliance Capital Management* litigation (02–CA–1104), which also covered Savage's role at Alliance and Enron. Counsel additionally deposed Alliance's designated experts. Exs. 18, 25, and 26.

disputed facts (# 4717) to support its argument.

Alliance maintains that the record establishes (1) that Savage was approached by an independent search firm to join the Enron board,[15] (2) that Alliance did not ask or encourage Savage to serve on the board, (3) that Alliance never compensated Savage in any way for serving as an Enron director, (4) that Alliance granted Savage's request for permission to serve on the board because Savage agreed to be "walled off" from any Alliance–Enron investment activity, (5) that Alliance had no power to influence Savage's acts as an outside director of Enron, (6) that Savage wrote to Alliance's Chief Compliance Officer that Savage's activities relating to Enron were "personal in nature," (7) that Alliance had no role in Savage's decision to sign the registration statement, (8) that Savage never discussed the registration statement with anyone at Alliance,[16] and

(9) that Alliance had no prior knowledge or reason to believe that the registration statement contained any false or misleading statements.[17] Savage testified that he was not aware of any benefit or advantage received by Alliance Capital as the result of his serving on Enron's board, that he never tried to protect Alliance's interests while on the board, that no one at Alliance asked him to do so, that he never gave anybody at Alliance nonpublic information about Enron, and that no one at Alliance ever asked him to do so. Alliance points to Savage's deposition testimony and the sworn statements of Williams and Calvert as evidence of a lack of authority to control to rebut any inferences of control from Savage's position or status at Alliance and at Enron.

Although Plaintiffs' complaint (# 1388) at ¶ 83(ee) conclusorily alleges that "Savage sat on Enron's board to protect Alliance interests and so Alliance would re-

15. Alliance says that it is undisputed that Savage twice declined such an invitation, in approximately 1997 and 1998, without discussing it with anyone at Alliance. At the time Savage was also serving on the boards of three public corporations beside that of Alliance Capital Management and he had told Alliance that he would not take on additional board positions. When asked a third time in late 1999, Savage went to Alliance's Chairman, Dave Williams, and proposed resigning from one of his three outside directorships and joining the Enron board. Alliance asserts that in accordance with Alliance's standard outside-director policies, Williams approved the request because Savage agreed to be walled off from Alliances's Enron-related investment activities. Alliance maintains that Savage was fully aware of his obligation to separate his role as an Enron outside director from Alliance's investment activities, i.e., a Chinese Wall between Savage's Enron activities and Alliance's Enron-related investment activity, as evidenced by Savage's deposition testimony. Savage also testified that there was a code of ethics which he followed. Savage joined the Enron board on October 12, 1999.

Plaintiffs disagree. They maintain that Alliance did "place" Savage on the Enron board because Chairman Williams approved his request to become an outside director at Enron. They also object that there is no evidence that Alliance customarily allowed its employees requesting to join outside boards to do so. The Court observes that it is Plaintiffs' burden to show that it did not do so, if they wish to pursue that line of evidence.

16. Plaintiffs respond that under Fifth Circuit law they do not need to show that Alliance was actually involved in the primary violation to show that Alliance had control over Savage nor do they need to show scienter. They contend that Alliance controlled Savage because he could not have sat on the Enron board without Alliance's approval and thus could not have committed the § 11 violation absent that approval.

17. With respect to its affirmative defense of no knowledge or reasonable ground to believe, Alliance emphasizes Plaintiffs' contention that "Enron and others masked the massive fraud at Enron from the investing public."

ceive the benefits of what Savage learned as a director of Enron and a member of its Finance Committee," and that "Alliance controlled and directed Savage in his activities as a director of Enron," Alliance insists that they have no evidence to support these claims. Merely because Alliance employed Savage is not enough. "Status alone" is insufficient to establish controlling person liability. *Dennis,* 918 F.2d at 509–10. Alliance argues that Plaintiffs fail to identify who at Alliance had the power to control Savage's activities at Enron and insists the evidence demonstrates that Alliance did not have such power.

Alternatively, should the Court find Plaintiffs met their burden of a *prima facie* case of control, Alliance insists it has established its affirmative defense because at the time Savage signed the registration statement at issue, it did not know and had no reasonable ground to know that the registration statement was false and misleading. Alliance highlights the fact that Plaintiffs have argued that Enron concealed its fraud in sophisticated ways from the investing public, which necessarily included Alliance, yet now argue that it somehow knew what was happening at Enron.

As for Alliance's request for fees and costs under § 11(e), Alliance argues that Plaintiffs made no meaningful effort to discover facts supporting their claim against Alliance, did not notice anyone except Savage for deposition, and did not serve interrogatories or requests to admit on Alliance. Alliance contends that Plaintiffs should have withdrawn their claim once it became evident that there was no evidence to establish Alliance's control of Savage. *See, e.g., Johnson v. Yerger,* 612 F.2d 953, 959 (5th Cir.1980); *Oil & Gas Income, Inc. v. Trotter,* 395 F.2d 753, 753–54 (5th Cir.1968)(upholding district court's § 11(e) award even though plaintiff volun-

tarily dismissed suit because it did so only after lengthy proceedings); *Zissu v. Bear, Stearns & Co.,* 805 F.2d 75, 80 (2d Cir. 1986) (granting § 11(e) fees and costs where plaintiff failed to withdraw its claims once it was clear that no proof existed to establish them); *Wielgos v. Commonwealth Edison Co.,* 123 F.R.D. 299, 306 (N.D.Ill.1988) (recognizing a complete absence of evidence to support a claim renders it frivolous under § 11(e)).

**Plaintiffs' Response in Opposition**

Plaintiffs point out that they have established the requisite, underlying, primary violation of § 11 by Savage because through his attorney-in-fact, former Enron corporate secretary Rebecca Carter, he signed the registration statement covering the Zero Coupon Notes, or sat on the Enron board at the time it was filed. # 4734, Ex. 1 at 1055:1–25,005–06. That registration statement as a matter law contained untrue statements of material fact in violation of the 1933 Act because it incorporated Enron's admittedly false financial statements for 1998–2000 and its materially false first-quarter 2001 10–Q, misrepresentations Enron publicly admitted in October 2001.

They further argue that Alliance's control over Savage is evidenced by the fact that in October 1999, pursuant to an agreement and understanding between Savage and Alliance Chairman Williams, Savage sought and received permission to join the Enron board. # 4734, Ex. 3. Alliance clearly had the power to control the number of boards on which Savage could sit and the boards on which he could remain a member, which boards he could join, and whether his activities as an outside director on other corporate boards would lead to his termination as an Alliance employee. *Id.,* Ex. 1 at 1095: 4–5 (Savage testified that "Alliance permitted me to remain on the boards that I was on when I

joined the company"; *id.* at 1098: as part of the terms of Savage's employment at Alliance, Williams and Savage reached an express [18] agreement that Savage would serve as an outside director on the boards of only three public companies at a time). Williams and Alliance's Chief Compliance Officer Mark Manley reviewed and authorized Savage's request to join the Enron board, allowed Savage to remain on Enron's board, and took no action to prevent Savage's primary violation of § 11, i.e., prevent him from signing the registration statement. Ex. 1 at 1107:8–1108:5; Ex. 3; Ex. 5 at 53.[19] Plaintiffs insist that this evidence constitutes a *prima facie* case of control liability against Alliance [20] and leap to the much broader conclusion that the agreement between Savage and Williams "clearly provided Alliance with 'the power to influence and control the activities of' Savage regarding Enron."

Plaintiffs further charge that Chairman Williams, as a long-time director who signed documents that Alliance filed with the SEC, knew that Savage would be signing Enron filings with the SEC, but charge that Williams and Manley never forbade Savage from doing so. Ex. 1 at 1124:5–10. Had Williams not approved Savage's membership on the Enron board, argue Plaintiffs, Savage could never have violated § 11 by signing the registration statement at issue. Moreover, Williams knew that Savage owed fiduciary duties to both Alliance and Enron as a result of his positions with both.

Plaintiffs also present a letter from Kenneth Lay to Savage before Savage joined the Enron Board. According to Plaintiffs, the letter induced Savage to join the board to help Alliance's business. Ex. 14 ("We [Enron] have a great deal going on that would indeed overlap with some of the activities of your firm."). Plaintiffs also claim the letter raises fact questions about whether Savage served on Enron's board as a deputy of Alliance.

Citing *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1116 (5th Cir.1980), Plaintiffs identify Alliance's affirmative defense under § 11 as one of "good faith," [21] on which Alliance bears the

---

18. Savage testified that it was an "informal" agreement.

19. Plaintiffs argue that this control is not based on status or position alone, but on Alliance's conduct in approving the request to join the Enron board. They are not claiming that Alliance controlled Enron, but only Savage.

20. Plaintiffs note that under agency principles, the conduct, actions and legal liability of Williams and Manley are imputed to Alliance. *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1118 (5th Cir.1980).

21. The *Paul F. Newton* panel does distinguish the language of the affirmative defense under § 20(a) ("acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action") from that under § 11 ("had knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist"), but it observes that the legislative history indicates that § 20(a) was deliberately modeled on § 15. 630 F.2d at 1115. It also reads *Pharo* more broadly than *Dennis v. General Imaging, Inc.,* 918 F.2d at 508, 509 and nn. 16 and 17, which limited the similar interpretation of the two statutes to the term "control," while *Paul F. Newton* states that the *Pharo* panel "concluded that § 15 of the Securities Act and § 20(a) of the Securities Exchange Act are analogous provisions that should be interpreted similarly." *Paul F. Newton,* 630 F.2d at 1115. *Paul F. Newton* states that Congress' intent in enacting § 15 "was to impose liability upon persons who controlled corporations committing violations of the Securities Act but who might attempt to evade liability under common law principles by utilizing 'dummies' that would act in their place and under their control." 630 F.2d at 1115. It describes both statutes' affirmative defenses as "good faith defenses" reflecting

burden of proof. Plaintiffs insist that the evidence demonstrates that Alliance's purported Chinese Wall was "porous" and that Alliance failed in its duty of care to prevent Savage from breaching it on several occasions. Specifically Plaintiffs quote Savage's May 22, 2004 deposition testimony that it is up to the individual to comply with the Chinese Wall and to report any violation, a code of ethics issue, with no apparent oversight by Alliance and no written agreement. Ex. 16 at 167–69 ("I operated based on what I thought was the right thing to do."). Plaintiffs maintain that Alliance failed to monitor or supervise Savage's compliance with the Chinese Wall and code of ethics. They note that Savage testified that he never spoke to anyone at Alliance about the Chinese Wall. *Id.* at 169:16–19. Moreover, evidence demonstrates that Alliance first asked Savage only in February 2000 to sign a document acknowledging the existence of the Chinese Wall policy (*id.* at Ex. 4); Savage did not sign the document until February 2001, sixteen months after he joined the Enron board (*id.*). Plaintiffs argue that such a delay does not show a company acting in good faith and intent on exercising due care to avoid violations of securities laws by enforcing a robust Chinese Wall policy. It also undermines Alliance's contention that it allowed Savage to join the Enron board because he agreed to abide by the Chinese Wall procedures. Although the document that Savage finally signed "prohibited [him] from attending meetings or participating in discussions or conversations, etc. where [Enron] is discussed and where any other Alliance personnel are present," Plaintiffs emphasize that Savage never provided a written statement of recusal to anyone at Alliance, nor a written or verbal instruction to any-

one at Alliance not to circulate to him material regarding Enron's potential investment with Alliance in an African fund, nor any instructions not to copy him on correspondence to Enron. Ex. 16 at 112:19–114:8.

Plaintiffs charge that Savage violated the policy often They first focus in particular on two interactions between Savage and Alliance's primary Enron analyst, Annie Tsao, about what they characterize as nonpublic information. On one occasion, Tsao told Savage that Jeffrey Skilling cursed an analyst during a conference call; Savage then questioned Skilling about it and left Tsao a voice-mail stating that he was aware of Skilling's remark and had talked to Skilling about it. Ex. 1 at 1102:15–1104:5; Ex. 17 at 2561–63. Another time, note Plaintiffs, Savage commented on the proposed Enron–Dynegy merger to Tsao, telling her in November 2001, before the proposed merger failed, that it was a "good deal." Ex. 17 at 2563. This evidence of breaches of the Chinese Wall, according to Plaintiffs, would lead a rational jury to conclude that Alliance never acted with "due care to avoid the violations" by Savage. It also contradicts Alliance's contention that Savage never discussed any non-public information relating to Enron with Alliance.

Plaintiffs also point to a letter written by Savage to Cuthbert Roberts at Enron International on October 4, 1999, eight days before Savage was officially elected to Enron's board and three days before he sent his formal request for permission to Williams. The letter mentions that a few days earlier the two men had discussed Enron projects in Africa and Savage indicated that "Alliance is actively considering

Congress' intent to impose liability on controlling persons "only on the basis of a failure

to exercise due care." *Id.* at 1116.

a Fund" to invest in oil and gas projects. The letter continued, "If the Fund goes forward, [w]e [Alliance] would like to explore the opportunity to coinvest in Enron projects. Enron's vast experience in these sectors is a major factor in our interest." Ex. 19 at GFS–07655. Savage then asked Roberts to keep him informed about the status of these projects and that Savage would advise Roberts about "the status of the Fund as we go forward." *Id.*

Plaintiffs also point out that on December 14, 1999, two months after Savage joined the Enron board, Alliance's Leonard Murray, who apparently took over Savage's Enron-related duties after Savage joined Enron's board, sent Savage an email to which was attached a copy of a letter that Murray had sent to Cuthbert Roberts about a proposed Enron African joint venture in which Alliance had been asked to participate. Ex. 20 at AC–NWB000173–74. The email stated, "Enron has been pressing for a response." *Id.* at AC–NWB000172. Plaintiffs contend that the email raises issues as to whether Savage had removed himself from "any decision-making authority" relating to Enron matters at Alliance. Ex. 1 at 1084–85.[22] Plaintiffs note that the attached letter indicates that Murray met with Roberts and with an Enron employee, Shawn Long, about an Enron Joint Venture Opportunity. They then observe that Savage testified at his deposition that he could not recall whether he had communicated with Long, but may have, after he had become

an outside director of Enron. Ex. 1 at 1088:18–1089:4.[23]

Plaintiffs also point out that on July 12, 2001 Savage's assistant faxed Murray information about a forthcoming Enron earnings release conference. Ex. 21 at AC–NWB000117. When asked if Savage was surprised by Murray's letter after Savage had recused himself from Enron matters, Savage responded, "he's a young man. I don't know. You know, he's a young staff man. He could have—he *probably didn't have any appreciation if he did it for*—he knew—I recused myself from it and he understood that. He understood that clearly." # 4734, Ex. 1 at 1087:4–13. Plaintiffs represent that Murray was the only person Savage took with him when he left Alliance to begin Savage Holdings. *Id.*, Ex. 16 at 133:13–134:7. They also state there is no evidence that Savage reported "the breach."

In sum, argue Plaintiffs, Savage was not "walled off" from Alliance's Enron-related business; indeed, Plaintiffs challenge whether an effective Chinese Wall policy even existed at Alliance.

As to Alliance's defense that it had no knowledge nor reasonable ground to believe that the registration statement signed by Savage was materially false and misleading, Plaintiffs argue that the fact that Chairman Williams knew that Savage would be signing Enron filings with the SEC, including registration statements, and that Savage as an Enron director would be liable for any false registration

---

**22.** Savage testified that once he was elected to the Enron board, he recused himself from all matters involving Alliance investments in Enron-related transactions. He insisted that he "was not involved in these discussions," and stated, "I don't think receiving emails is being involved." # 4734, Ex. 1 at 1089090; Ex. 16 at 115, 119. Plaintiffs have not provided any evidence demonstrating that he was.

**23.** Despite suggestive allegations, the Court notes that Plaintiffs have not shown that Savage did communicate with Long, no less about anything of significance, nor that Savage was actually involved in discussions or work relating to the Enron Africa Joint Venture opportunity after Savage joined the Enron board.

statements covering the Zero Coupon Notes and filed with the SEC, raises genuine issues of material fact. They contend that the good faith exception "refers not to a particular transaction, but [generally] to the existence of the basic facts relating to" Savages's tenure and duties on the Enron board. *San Francisco–Oklahoma Petroleum Exploration Corp. v. Carstan Oil Co., Inc.*, 765 F.2d 962, 965 (10th Cir. 1985).[24]

Last, Plaintiffs insist Alliance is not entitled to an award of fees and costs under § 11(e) because their claim is not frivolous, lacking in merit, or brought in bad faith. They insist they have provided sufficient evidence of control to take the issue to a jury and thus their claim is not frivolous, without merit or brought in bad faith. They also point to the lawsuit brought by the Florida State Board with similar allegations against Savage and Alliance, which was tried before a jury. In addition, they complain that Alliance has made no attempt to quantify what reasonable fees and costs might be.

### Court's Decision

▋ Plaintiffs' allegations that Alliance had the power to control any of Savage's actions as an outside director of Enron, no less his signing of the registration statement at issue that constitutes the primary violation of § 11, are wholly conclusory; the Court finds that Plaintiffs fail to plead and to prove any specific facts sufficient for a reasonable jury to conclude that Alli-

ance was a control person with the power to control Savage in his capacity as outside director on Enron's board, no less in his decision to sign the registration statement at issue.

Under Fifth Circuit law, the fact that Alliance was Savage's employer alone does not establish power to control Savage's role as an independent, outside director of Enron.[25]

Chairman Williams' approval of Savage's request to join the Enron board and his awareness of what are standard activities of directors of public corporations, such as signing registration statements, are not evidence that Alliance had the power to control Savage's activities at Enron once he joined that board. Savage's agreement with the Chairman of Alliance to limit his activities as an outside director to three public companies at a time and to obtain permission to join each board does not authorize any additional power over Savage's actions in his capacity as an outside director of those boards. The Court agrees with Alliance that if mere approval of a corporate officer's request to serve on outside boards established controlling person liability, the effect would be to chill the willingness of distinguished and qualified individuals to serve on the boards of public companies as independent outside directors, all to the detriment of business. There is no evidence that Alliance had any authority to influence, supervise or determine Sav-

---

**24.** As noted, two district courts in the Fifth Circuit have concluded that the ability to control must relate to the particular transaction constituting the primary violation of § 11, here the signing of the registration statement.

**25.** While Plaintiffs cite *Martin v. Shearson Lehman Hutton, Inc.*, 986 F.2d 242, (8th Cir.1993)(concluding that plaintiff made out a *prima facie* case of controlling person liability against Shearson Lehman where its broker solicited the purchase of securities with mis-

representations to the investor's loss and the firm had the ability to discipline the broker; "Under our cases it appears that Shearson's status as employer is sufficient to establish it as a controlling person"), *cert. denied*, 510 U.S. 861, 114 S.Ct. 177, 126 L.Ed.2d 136 (1993), this Court is bound by the Fifth Circuit's holding in *Dennis*, 918 F.2d at 509 (Position or status, alone, does not prove control).

age's actions at Enron, nor any evidence that Alliance induced Savage to watch out for Alliance's interests while on Enron's board, nor that Savage did watch out for Alliance's interest after joining the Enron board. Nor is there evidence demonstrating how Williams or Alliance, without Enron-inside-information, could investigate the registration statement and determine that it was false and misleading before Savage signed it. Furthermore a year and a half passed between the time Williams approved Savage's request for permission to join Enron's board in October 1999 and Savage's authorizing the signing of the registration statement in his name on May 31, 2001, during which Plaintiffs have failed to prove any material fact suggesting control.

As pointed out in Alliance's reply (# 4834 at 8), Lay's letter, which Plaintiffs claim raises fact questions about whether Savage served on Enron's board as a deputy of Alliance, was dated February 22, 1999, more than seven months before Savage joined Enron's board and two and a half years before he signed the registration statement. # 4734, Ex. 14. The letter does reflect Lay's interest in recruiting Savage, obviously an experienced and knowledgeable outside director, to serve on Enron's board. The substantial time gap between the meeting between Lay and Savage memorialized in the letter and Savage's election to and joining the Enron board and the vagueness of the statement ("We [Enron] have a great deal going on that would indeed overlap with some of the activities of your firm.") are insufficient to demonstrate that Savage joined the board with the intention of benefitting Alliance, no less that he actually worked to do so. Savage testified that he did not think about benefitting Alliance when he joined Enron's board, that no one at Alliance asked him to share any information that he received as an Enron outside director, that

he never shared any such information with Alliance, that no one at Alliance ever asked him to protect Alliance's interests while he served on the Enron board, that he did not sit on Enron's board in order to protect Alliance's interests, that he never discussed the investments in Enron made by Alliance with anyone at Alliance, and that no one at Alliance ever influenced his actions or pressured him to share nonpublic information as an Enron director. Declaration of Jason A. D'Angelo (# 4718), Ex. 2 (Transcript of Savage Dep. on 1/20/05 at 918–20. Plaintiffs have failed to present any evidence of a material effort by anyone at Alliance to pressure, influence, or obtain nonpublic information (including a nonpublic draft of the registration statement at issue) from Savage in his capacity as an Enron outside director. The incidents that Plaintiffs cite are clearly not material. A " 'mere scintilla of evidence' [is not] sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.' " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *quoting Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505. The Fifth Circuit requires that the nonmovant produce "significant probative evidence" to support such a reasonable jury finding. *Owens v. United States of America Bureau of Prisons*, 54 Fed.Appx. 409, 409 (5th Cir.2002), *quoting State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir.1990).

Logically to have control over Savage's actions as an outside director on the Enron board or to defeat Alliance's affirmative defense, Alliance would have had to have known what Savage was doing while sitting on Enron's board; Plaintiffs have submitted no evidence that Alliance was privy to anything Savage dealt with at Enron or that Alliance had active or constructive knowledge of what he was doing, in partic-

ular signing the registration statement, no less that it could have stopped Savage or even "allowed" him to continue what he was doing.[26] Instead, as Alliance points out, all the evidence in the record indicates otherwise. Nor have Plaintiffs provided any specific factual evidence of any instance in which Savage was acting in Alliance's interest while fulfilling his role as an outside director of Enron. Indeed, as argued by Alliance, since Alliance was solely an investment advisor that received a small fee based on the value of its client's holdings and since Alliance continued to hold Enron stock for its clients for months after Savage signed the false and misleading registration statement, had Alliance known or had reason to know that the statement was false and misleading, it would not have, as it did, held onto the stock for its clients until days before Enron declared bankruptcy.

Nor is there "significant probative evidence" of any material communications in breach of Alliance's Chinese Wall and ethics code between Alliance and Savage regarding Enron securities offerings or investments after Savage became an Enron outside director. The first incident with Tsao raised by Plaintiffs was not material to the issue of control. Tsao emailed Savage that Skilling had called another research analyst an "asshole." Ex. 17 (Excerpts from the trial transcript of *The Florida State Board of Administration v. Alliance Capital Management*, 02–CA–1104) at 2561. Indeed, just before that statement, Tsao was asked, "Did you ever speak to Mr. Savage about his board service,?" and she responded, "No." *Id.* She explained during the Florida State Board

trial that she had left the message on Savage's email because the price of Enron stock had dropped substantially after Skilling's comment and she thought Savage should know about it because he was on Enron's board. *Id.* at 2562–63.[27] Tsao did not ask Savage for any action and Savage never spoke to Tsao about the matter. *Id.* at 2563. As for the second incident, on a public elevator, four months after Savage signed the registration statement at issue and after the Dynegy merger had already been approved by Enron directors and publicly announced, Tsao asked Savage what he thought about the Dynegy merger. Savage simply responded that it was "a good deal," hardly a material communication of non-public information, no less of substance. *Id.* at 2564. Without "significant probative evidence" of specific, material breaches by Savage, the existence of the Chinese Wall and the code of ethics relating to it undermines Plaintiffs' arguments. Moreover neither incident related to the misleading registration statement at issue. Furthermore, while Savage testified that he policed his own compliance with the Chinese Wall and code of ethics, without a showing by Plaintiffs of a material breach by Savage, Plaintiffs' suggestive but conclusory assertion will not preclude summary judgment.

Similarly, Savage's letter to Cuthbert Roberts, written eight days before Savage was officially elected to Enron's board and three days before his official request to Chairman Williams to approve his joining Enron as an outside director, was drafted in Savage's capacity as an Alliance officer. Plaintiffs further charge that after Savage

---

**26.** While evidence that Alliance actually controlled or influenced Savage's Enron activities is not required by the Fifth Circuit, such evidence would support the allegation that Alliance had the power to control; such evidence is also lacking.

**27.** Reflecting how insignificant the matter was, Savage confused the two incidents and thought Tsao also made the comment about Skilling's name calling on an elevator. Ex. 1 at 1102–1104.

joined the Enron board, on December 14, 1999 Leonard Murray sent an email to Savage with an attached copy of a letter from Murray to Cuthbert Roberts, written after Murray had met with Roberts and Long about a possible Enron African joint venture opportunity. That allegation is insufficient to prove that Savage became involved with the proposed venture or even communicated with Cuthbert Roberts or Murray afterwards. Indeed the attached letter clearly states that Alliance was only in the early stages of forming an African Fund and was not able to fully commit to such an opportunity at the time. Plaintiffs also highlight the fact that on July 12, 2001 Savage's assistant faxed Murray information about a forthcoming Enron earnings release conference call. An examination of Ex. 21 reveals that someone named "Yolanda" forwarded to Savage nineteen messages from a variety of people about different matters, one of which states that a fax was sent to Savage about an Enron earnings release conference call, which Yolanda would forward to Murray. Neither the email nor the fax demonstrates that Savage became involved in the potential joint venture or the conference call. # 4734, Ex. 20 at AC–NWB000172–74. Savage testified that he "recused totally from any decision making authority relative to any occasion with Enron on this Africa fund," and that he "was not in any way involved" in it. # 4734, Ex. 1, Dep. on 1/21/05 at 1089–90. There is no controverting, significant probative evidence from Plaintiffs indicating any response by Savage to either email, no less affirmative involvement in either matter.

Even if Plaintiffs had established a *prima facie* case of control so that the Court would address Alliance's affirmative defense, while Alliance might have reasonable ground to believe an outside director would sign a registration statement, that expectation is not equivalent to having a reasonable ground to believe an outside director would sign a false and misleading statement, nor that there is a reasonable ground to believe the Enron registration statement at issue was false and misleading. Nor have Plaintiffs provided any evidence that Alliance or Savage knew or should have known or suspected that the registration statement was false and misleading at the time Savage signed it.

As for attorney's fees and costs under § 11(e), the Court finds that at the time this suit was filed, given the sophisticated concealment of Enron's financial condition, Plaintiffs' suspicions arising from Savage's dual-hat roles at Alliance were not unreasonable. Thus at its inception and at least through Savage's deposition in January 2005 and for a period of discovery thereafter, the Court finds that this case was not frivolous, without merit, and/or brought in bad faith. It appears to this Court, however, that the summary judgment briefing should not have been necessary and the continuance of the claim against Alliance was at that point without merit. Accordingly, the Court finds that an award of fees and costs related to the summary judgment stage of the litigation only should be granted to Alliance.

Thus the Court

ORDERS that Alliance's motion for summary judgment is interlocutorily GRANTED. The Court further

ORDERS that Alliance's motion for attorney's fees and costs under § 11(e) related to the summary judgment briefing is GRANTED. Alliance shall file within twenty days of entry of this order an appropriate and reasonable request for a specific amount in fees and costs, with supporting documentation. Plaintiffs shall file a response within ten days of receipt of that request.